JUDD, ADMR., APPELLEE, *v.* QUEEN CITY METRO, APPELLANT.

(No. C-860320 — Decided December 17, 1986.)

Beall, Hermanies, Bortz & Major and Ronald D. Major, for appellee.

Steer, Strauss, White & Tobias and James J. Ryan, for appellant.

Per Curiam. The principal question in this appeal is whether a post-judgment settlement agreement made between the attorney for defendant's insurer and plaintiff's attorney is binding on defendant. Acknowledging that mere employment to represent a client in litigation does not convey authority to the attorney to settle the dispute, we hold that the evidence was sufficient to support the trial court's conclusions that the insurer's attorney had specific authority from defendant to settle the liability and that the settlement agreement was valid and binding.

The settlement agreement provided for the satisfaction of a judgment obtained by plaintiff-appellee Theodore Michael Judd, Administrator of the Estate of William Judd, deceased (referred to as "plaintiff"), against defendant-appellant Queen City Metro ("defendant"); that judgment was in the amount of $805,325.59, for wrongfully causing the death of William Judd (plaintiff's son) on November 13, 1981. At the time of the accident, defendant was insured by ·Transit Casualty Company ("defendant's insurer" or "the insurer") under a policy that obligated it to indemnify[1] defendant for the ultimate net loss arising from personal injury caused by defendant over and above defendant's "underlying retained limit" (or deductible) of $100,000 up to a policy limit of $900,000. The policy made defendant responsible for the defense, settlement, and expenses arising out of any personal injury that it caused, but defendant's insurer could "associate with" defendant in the defense and control of the trial. No settlement could be made prior to judgment in excess of the underlying retained limit without the insurer's consent.

Defendant carried out its responsibility to defend against plaintiff's claim, engaging the services of its own counsel, John M. McCaslin, Jr. After defendant's motions for judgment notwithstanding the verdict and for a new trial were overruled, J. R. Hartlieb, defendant's Risk Manager, notified its insurer that defendant elected not to appeal. This was accomplished by a letter

---

[1] The trial court relied in part on plaintiff's agreement that the policy under scrutiny was one of indemnity rather than one of insurance; the distinction between the two is that under an insurance policy, the insurer's liability arises when judgment is rendered, whereas under an indemnity policy, the indemnitor's liability arises only after the insured has paid the liability. We are not persuaded that this distinction has any legal significance in this case. The controlling issue is whether the insurer's attorney was authorized by the insured to settle a liability and we find no error in the trial court's conclusion that he was so authorized. The character or classification of the policy is immaterial. Further, the practical effect of R.C. 3929.05 and 3929.06, which state the insurer's liability is absolute whenever the covered loss occurs without the necessity for a satisfaction of the judgment, is to make all policies against liability to third parties for personal injury or property damage "liability" insurance.

dated June 5, 1985, from Hartlieb to Leon S. Jacobs, the insurer's Division Claims Manager. Defendant conceded that at that time it was prepared to pay the judgment in full. At a meeting on June 11, 1985, between McCaslin and Hartlieb for defendant and Jacobs for its insurer, Jacobs stated that the insurer would take over the case and appeal the judgment if it was unable to reach a settlement with plaintiff. This was a crucial moment in the relationship between defendant and its insurer, when viewed in the light of subsequent developments.

Hartlieb acknowledged that when he turned the case over to Jacobs, he gave the insurer the right to decide whether to appeal or to settle, and if its decision was to settle, the right to bind defendant to pay the underlying retained limit of $100,000.[2]

On the same day as the turn-over conference, McCaslin wrote Hartlieb advising him that Leo Breslin was chosen as counsel by the insurer and would be substituted as defendant's counsel of record in the litigation. McCaslin also advised plaintiff's attorney that "Leo Jacob [sic] of Transit Casualty Company was in town today and wanted to talk to you. He is interested in seeing if a settlement can be reached before we appeal."

It is undisputed that defendant placed no restrictions or limitations on the authority of its insurer or insurer's counsel to settle the case, either by communication to the insurer or by advising plaintiff or his attorney. Neither defendant nor its attorney insisted on being kept advised of all developments after June 11, 1985.

Breslin was substituted as defendant's counsel of record in the trial court and filed the notice of appeal from the judgment for $805,325.59 on July 18, 1985. McCaslin was duly notified. That appeal is still pending under docket No. C-850510.

After Breslin found it impossible to obtain a supersedeas bond,[3] settlement negotiations with plaintiff's attorney were intensified. On October 29, 1985, plaintiff's attorney advised Breslin he was authorized to settle for the flat sum of $805,000 (without interest). Breslin was advised by Jacobs that he had authority to settle for that amount and to dismiss the appeal. On December 3, 1985, at about 8:45 a.m., Breslin advised plaintiff's attorney he accepted the settlement. Plaintiff's attorney confirmed the agreement by letter to Breslin, and Breslin wrote Jacobs advising him of the amount and asking that a check be "made out" to plaintiff and his attorney for $805,000. There was no question in

---

[2] Hartlieb testified as follows:

"Q. [By plaintiff's attorney] All right. So, after the meeting of June 11th, 1985, when Transit Casualty told you that they would take the appeal, you delegated all of those contractual rights, that is the right to appeal, pay expenses, pay litigation, costs of settlement to Transit Casualty?

"A. That's right.

"* * *

"Q. [By the insurer's attorney] Now, please look at the paragraph which follows the one you just read. Would you read that paragraph, please?

"A. 'The company shall have the right to discharge its liability on accounts of any or all claims or suits arising out of an occurrence

by paying to the insured the lesser of (1) the difference between the underlying retained limit and the amount required to settle any or all such claims or suits, or (2) the company's excess indemnity limit set forth in Item 4, Section II of the Declaration.'

"Q. Under that language, did Transit Casualty Company have the right to settle any claim and obligate you to pay the underlying $100,000?

"A. Yes."

[3] We are told in oral argument on appeal that it was realized later that defendant is a "political subdivision" of the state and did not have to furnish a bond to perfect the appeal. R.C. 2505.12(B).

Breslin's mind that "there had been a settlement."

At 2:00 p.m. on December 3, 1985, however, Breslin learned that defendant's insurer was in receivership or conservatorship in a Missouri court. Defendant took the position that it repudiated the settlement agreement.

Plaintiff thereafter moved this court to dismiss defendant's appeal in case No. C-850510 on the grounds that defendant was bound by the settlement agreement to abandon the appeal. After consideration of that motion and a motion for a remand, this court remanded the case to the trial court "both for the determination of the issue of whether, after the filing of the Notice of Appeal herein, the parties entered into a valid and binding settlement agreement as alleged in Appellee's Motion to Dismiss Appeal and for determination of any other issues that properly now are or may be brought before the trial court." No other issues were brought before that court. After an evidentiary hearing on the validity of the settlement agreement (the evidence is summarized in the preceding paragraphs), the trial court found that the settlement agreement was valid and binding on both parties and ordered defendant to pay plaintiff $805,000 plus interest from December 3, 1985, in exchange for a full release from the earlier judgment, and to dismiss the appeal in case No. C-850510. The court also filed findings of fact and conclusions of law. Defendant promptly appealed the finding and the order under the instant docket No. C-860320. We refused to consolidate the two appeals.

In its first assignment, defendant claims error in plaintiff's failure to file a separate, original action for determination of the agreement's validity. The claim has no merit. Not only is the original trial court the usual arbiter of agreements settling lawsuits on their dockets, *Mack* v. *Polson Rubber Co.* (1984), 14 Ohio St. 3d 34, 14 OBR 335,

470 N.E.2d 902; *Morform Tool Corp.* v. *Keco Industries, Inc.* (1971), 30 Ohio App. 2d 207, 59 O.O. 2d 320, 284 N.E. 2d 191; but also that was the specific order of this court, binding defendant to this procedure in the absence of any overruling of our order by a higher tribunal. Defendant is bound by the law of the case.

In the second assignment of error, defendant contends that plaintiff had "abandoned" the settlement agreement by seeking to enforce the judgment itself by proceedings in aid of execution (garnishment), and that the trial court erred when it "allowed plaintiff to seek to enforce" the agreement. This contention has no merit. We find no inconsistency in the attempt by a victorious litigant to recover amounts due him under his judgment when the victor also has a settlement agreement that the defendant has brought into jeopardy by repudiating it and refusing to pay. A victorious party is entitled to take all legal steps to protect his interests and does not waive or abandon any course of action open to him in the absence of an intentional relinquishment of a known right. There was none demonstrated in this case.

Defendant's third assignment asserts error in finding the settlement valid and binding. It is Ohio law that without specific authority, an attorney has no implied or apparent authority arising from his employment to compromise and settle his client's claim or cause of action. The leading case is *Morr* v. *Crouch* (1969), 19 Ohio St. 2d 24, 48 O.O. 2d 43, 249 N.E. 2d 780, and it follows the "almost universal" rule. Annotation, Authority of Attorney to Compromise Action (1953), 30 A.L.R. 2d 944. But, see, *Peyko* v. *Frederick* (1986), 25 Ohio St. 3d 164, 25 OBR 207, 495 N.E. 2d 918, and *Weir* v. *Needham* (1985), 26 Ohio App. 3d 36, 26 OBR 205, 498 N.E. 2d 175. In the instant case, however, we find sufficient evidence to support the trial court's conclusion that

on June 11, 1985, defendant conferred on its insurer and on the insurer's counsel specific authority to compromise and settle the judgment against it, including the authority to dismiss the appeal in case No. C-850510.[4] We point to the summary of the evidence in the preceding paragraphs of this decision. The third assignment of error has no merit.

We affirm.

*Judgment affirmed.*

DOAN, P.J., KEEFE and BLACK, JJ., concur.

---

[4] We do not rest our decision on the alternative grounds of apparent authority, used by the trial court, because it is our understanding that the principles of apparent authority come into play only when there is no express authority. *Miller* v. *Wick Building Co.* (1950), 154 Ohio St. 93, 42 O.O. 169, 93 N.E. 2d 467; *Ammerman* v. *Avis Rent A Car System, Inc.* (1982), 7 Ohio App. 3d 338, 7 OBR 436, 455 N.E. 2d 1041. We do *not* reach the question whether specific authority to settle may arise by appearances (implications of the circumstances).